UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ELI RESEARCH, LLC and AMERICAN
ACADEMY HOLDINGS,

        Plaintiffs,

v.                                  Case No:   2:13-cv-695-FtM-38CM

MUST HAVE INFO INC., SAMANTHA
SALDUKAS and LACY GASKINS,

        Defendants.
_____/

**ORDER[1]**

      This matter comes before the Court on Defendants, Samantha Saldukas and Lacy

Gaskins' Motion for Summary Judgment against the Plaintiffs Eli Research LLC and

American Academy Holdings, LLC (collectively Eli) (Doc. #132) filed on July 6, 2015.

Plaintiff, Eli filed its Response in Opposition (Doc. #152) on July 21, 2015.  The Motion is

fully briefed and ripe for the Court's review.

**FACTS**

      Defendants Saldukas and Gaskins are former employees of Eli Research LLC

(Eli).  Saldukas started working in the newsletter business in 1990 for Global Success

Corporation (GSC) which was owned at that time by Dr. Leslie Norins.  In 1998, GSC

launched a newsletter publication for pediatricians known as _Pediatric Practice_

---

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or websites.  These hyperlinks are provided only for users' convenience.  Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites.  Likewise, the Court has no agreements with any of these third parties or their websites.  The Court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

Management.   After launching Pediatric Practice Management, Saldukas states she began receiving questions about coding.  GSC then launched another newsletter known as Pediatric Coding Alert.   That publication was the beginning of The Coding Institute (TCI).   GSC subsequently launched twenty-eight (28) other publications as part of TCI. After four (4) years TCI was publishing over thirty (30) newsletters.  Saldukas eventually became president of GSC and was involved in all aspects of producing TCI's newsletters. Saldukas states that all of her newsletter publishing knowledge and experience came from her time working for Dr. Norins at GSC.

In 2002, Dr. Norins sold GSC to Eli including the assets of TCI Newsletter and their ancillary products.  After the sale, Saldukas was offered a job with Eli.  On or about March 28, 2002, Saldukas entered into an employment contract with Eli.  Saldukas' employment contract contains a confidentiality provision in which Saldukas agreed not to personally use or disclose Eli's trade secrets or confidential information.

Eli argues that all of GSC's confidential information about the newsletter publishing business was purchased at the time TCI was purchased from Dr. Norins.  Specifically, Eli states it purchased all twenty-seven (27) newsletters, style guides, Eli editorial manuals, subscriber lists generated through years of direct mail and telemarketing, customer renewal dates, marketing plans and tactics that were unique to the company, subscriber counts, cancelled subscriber lists, renewal rates, source relationships, source databases, consulting editor contract relationships, consulting editor information, reader surveys, customer service protocol, company financial information, and profitability reports. (Doc. # 152, Ex, A, ¶5).  Eli claims the purchase also includes Dr. Norins' recipe for publishing newsletters.

In April 2006, Saldukas hired Gaskins to be the live conference manager at Eli. Gaskins signed a non-compete, confidentiality and non-solicitation contract. Gaskins states that she entered into an employment contract with Eli Research, Inc. which is not a party to this litigation. Gaskins states that she never signed an employment contract with Eli Research, LLC. However, Eli states that Gaskins employment contract was with Eli Research, Inc. "its subsidiaries, affiliates, successors and assigns." Eli Research, Inc. now operates as part of Academy Associations, Inc. which is the parent company of Eli Research, LLC.

In 2009, Gaskins left her employment with Eli to work with her in-laws. ([Doc. #152](), Ex. M at 68:9-14). Shortly afterwards, Gaskins began to work for Dr. Norins at his new company Principal Investigation Association ("PIA"). *See* Ex. M at 15:3-15, 68:18-22. Eli never authorized Gaskins to work for Dr. Norins or to launch directly competing, specialty specific medical coding newsletters or audio conferences.

In March 2010, Saldukas terminated her employment with Eli. In January of 2012, Saldukas incorporated Must Have Info, Inc. (MHI). Saldukas states that she did not engage in any prohibited activity under the terms of her employment, confidentiality, non-complete contract with Eli. On November 21, 2012, MHI filed for a fictitious name and is doing business as Coding Leader.

Saldukas asserts that Coding Leader purchased mailing lists of targeted professionals from a list broker and that she used that list to launch her marketing campaign. MHI structured its editorial process similar to that of GSC, using freelance editors. MHI also used freelance editors to produce its content for its two (2) coding letters. Saldukas claims that MHI used several documents to train its freelance editors to

produce content for its two coding newsletters in the desired style and format. These documents included a Newsletter Questionnaire, Story Budget Template, an article marked up to demonstrate "What, How and Why," a Freelance Writer-for-Hire Addendum/Style Guide, and Editorial Guidelines. (Doc. #52-1, Ex. F, ¶44). Saldukas states that all of those template, editorial guides, and questionnaires were created by her based upon her experience with Dr. Norins and not from her experience with Eli.

Both Gaskins and Saldukas had access to all of Eli's confidential information while they were employed with Eli. Eli contends that all of their manuals are written documents that give specific direction on, among other things, the particular format and technique for writing coding newsletters. (Doc. #152, Ex. D at ¶3; Ex. D-A, B. 41). Style guides, which provide guidelines as to the style of newsletters, are incorporated in the manuals. (Doc.# 152 Ex. B at ¶14).

## CHOICE OF LAW

Both Saldukas and Gaskins' employment contracts state that the contract will be governed by and construed under the laws of the State of North Carolina. Therefore, the Court will apply the laws of the State of North Carolina in determining the Motion for Summary Judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is genuine if there is sufficient evidence such that a reasonable jury could return a verdict for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 U.S. 2505, 91 L. Ed. 2d 202 (1986). Similarly, an

issue is material if it may affect the outcome of the suit under governing law. Id.   The moving party bears the burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  In deciding whether the moving party has met this initial burden, the Court must review the record and all reasonable inferences drawn from the record in the light most favorable to the non-moving party.  Whatley v. CNA Ins. Co., 189 F.3d 1310, 1313 (11th Cir. 1999); See U.S. v. Four Parcels of Real Property, 941 F.2d 1428, 1437–38 (11th Cir.1991)(en banc) (holding that "[t]o prevail, the moving party must do one of two things: (1) show that the non-moving party has no evidence to support its case, or (2) present "affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.").

Once the Court determines that the moving party has met its burden, the burden shifts and the non-moving party must present specific facts showing that there is a genuine issue for trial that precludes summary judgment.  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  "The evidence presented cannot consist of conclusory allegations, legal conclusions or evidence which would be inadmissible at trial."  Demyan v. Sun Life Assurance Co. of Canada, 148 F. Supp. 2d 1316, 1320 (S.D. Fla. 2001) (citing Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991)).  Failure to show sufficient evidence of any essential element is fatal to the claim and the Court should grant the summary judgment.  Celotex, 477 U.S. at 322-323.  Conversely, if reasonable minds could find a genuine issue of material fact then summary judgment should be denied.  Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1532 (11th Cir. 1992).

## DISCUSSION

Count VII of Eli's Amended Complaint alleges that Saldukas and Gaskins each entered into a binding employment contract with Eli.  Eli claims the contract included promises from Saldukas and Gaskins not to compete or divulge or disclose the information and materials they obtained while working for Eli.  Eli continues that "Saldukas and Gaskins, by disseminating, using, and misappropriating Eli's confidential materials in whole or in part during the course of their work for Coding Leader, breached the nondisclosure provisions of the Eli Contracts." (Doc. #37, ¶128).  The Amended Complaint continues "[u]pon information and belief, Defendants Saldukas and Gaskins purposefully, with malice and a specific intent to harm Eli knowingly, intentionally and willfully breached their obligations under the Eli Contracts." (Doc. #37, ¶131).

Defendants argue they should be granted summary judgment because: (1) Gaskins did not have a contract with Eli; (2) the confidentiality agreement did not prevent Saldukas and Gaskins from utilizing information they learned prior to and after working for Eli; (3) the use of Dr. Norins' Recipe is not confidential nor owned by Eli; (4) Eli's Editorial Manual and Executive Editorial Manual do not contain confidential information; (5) there is no direct evidence the Defendants took or used confidential information; and (6) Gaskins and Saldukas can solicit employees and third parties who have relationships with Eli because the non-solicitation clause in their employment contracts expired after twenty-four (24) months.

North Carolina courts have long stated that covenants not to compete between an employer and an employee "are not viewed favorably." Philips Electronics North America Corp. v. Hope, 631 F.Supp.2d 705, 714 -715 (M.D.N.C. 2009) (citing VisionAIR, Inc. v.

James, 167 N.C. App. 504, 508; 606 S.E. 2d 359, 362 (2004) (internal quotation marks and citation omitted). Under North Carolina law, a covenant not to compete is valid if it is (1) in writing, (2) made part of the employment contract, (3) based on valuable consideration, (4) reasonable as to time and territory, and (5) designed to protect a legitimate business interest of the employer. Philips Electronics, 631 F.Supp.2d at 714 - 715 (citing A.E.P. Indus., Inc. v. McClure, 308 N.C. 393, 402–03, 302 S.E.2d 754, 760 (1983)). In this case, the non–compete agreement is in writing, is part of Saldukas employment contract, geographically covers the North American Continent, limits the non-compete period to twenty-four (24) months, and recites that the $100,000 plus bonus paid to Saldukas was adequate consideration. (Doc. #132, Ex. L, Saldukas Depo. Ex. 5, § 10.).  There is no dispute that a valid employment contract existed between Saldukas and Eli.

### (1) *Whether Gaskins has a Contract with Eli*

Defendants argue that Gaskins employment contract was with Eli Research, Inc. a corporation that no longer exists.  Therefore, Gaskins states she could not have breached a contract between herself and Eli Research, LLC.  Eli argues that Eli Research, Inc. is now known as American Academy, Inc. the parent company of Eli Research, LLC. Eli argues the Gaskins' contract states that it is with Eli Research, Inc. "its subsidiaries affiliates and assigns" and is, therefore, still binding on Gaskins.

Eli's argument is well taken.  Under North Carolina law, a corporation generally may enforce a non-competition agreement executed by an employee of its predecessor in interest. "'[A] covenant not to compete with a business is assignable'" as part of an asset purchase agreement. Philips Electronics North America Corp. v. Hope, 631

F.Supp.2d 705, 714 -715 (M.D.N.C. 2009) (citing Reynolds & Reynolds Co. v. Tart, 955 F.Supp. 547, 556 (W.D.N.C.1997)).  Since American Academy is the successor of Eli Research, Inc. and is the parent company of Eli Research, LLC, Gaskins' employment contract between herself and Eli Research, LLC is valid.

<u>(2)Whether the Employment Contract Prevented Saldukas and Gaskins from Utilizing Information they Learned Prior to and after Working for Eli</u>

Defendants argue the employment contract prevents Saldukas and Gaskins from using the information they learned while working for Dr. Norins at GSC prior to being employed by Eli.  Eli argues that it purchased all of Dr. Norins trade secrets and confidential information when it purchased GSC without time limits as to their use.  Eli argues that even without an employment contract neither Saldukas nor Gaskins could use its confidential or trade secret information.  Eli continues that all of Saldukas' know-how information came with her from GSC and that Eli purchased all of GSC's know-how information when they purchased the newsletter publication division of GSC from Dr. Norins.  Thus, Eli asserts that neither Saldukas nor Gaskins may use any of its trade secret, confidential information or know-how learned while employed by Dr. Norins at GSC.

Eli's interpretation of the employment contract is overbroad.  Under the terms of the contract between Saldukas and Gaskins, the Defendants may use the information and knowledge they have garnered over the years twenty-four (24) months from the end of their respective employments with Eli.  Saldukas' employment contract reads in pertinent part:

10.  Non-Competition Agreement

(a) Covenants

> [Saldukas] acknowledges that as a result of her employment with the Company, she will acquire knowledge of the Company's Trade Secrets and Confidential Information, and that the business of the Company in which she will be engaged regularly involves interaction and the gathering and dissemination of information and data throughout the continent of North America.  [Saldukas] further acknowledges that []any disclosure of the Company's Trade Secrets and Confidential Information would be susceptible to immediate competitive application by a competitor; that the Company's business is substantially dependent on access to and the continuing secrecy of Trade Secrets and Confidential Information; and that [Saldukas'] acceptance of or participation in any employment, consulting engagement, or other business opportunity for an entity other than the Company where she would perform work of a similar nature to that performed by her for the Company would inevitably result in the disclosure or use of the Company's Trade Secrets and Confidential Information.
>
> Therefore, during [Saldukas'] employment with the Company and for a period of twenty-four (24) months following termination of her employment, she will not, in any capacity, perform services that are similar to those performed by her as an employee of the Company for the benefit of any Competitive Business in North America. . . .

(Doc. #132, Ex. L, Saldukas Depo. Ex. 5, § 10.).   Gaskins' employment contract reads the same. (Doc. #132, Ex. M, Gaskins Depo, Ex 3, §7).

Saldukas left Eli's employment in March 2010.  Saldukas' non-compete agreement with Eli expired twenty-four (24) months later in March of 2012.  In January of 2012, Saldukas incorporated Must Have Info, Inc.  There is no evidence to show that Saldukas engaged in any prohibited activity under the terms of her Employment, Confidentiality, Non-complete Agreement with Eli during that time.  On November 21, 2012, MHI filed for a fictitious name and began operating as Coding Leader.  Eli does not present any direct evidence that Saldukas used her knowledge or information learned from Dr. Norins or Eli prior to November 2012.

Gaskins was employed with Eli from April 2006 through 2009.  Gaskins left her employment with Eli to work with her in-laws.  (Doc. #152, Ex. M at 68:9-14).  Shortly afterwards, Gaskins began to work for Dr. Norins at his new company Principal Investigation Association ("PIA").  (Doc. #152, Ex. M at 15:3-15, 68:18-22).

Eli argues that it is not referring to the non-compete section of the employment contract but the non-disclosure section.  It reads as follows:

> 9.   Non-Disclosure of Trade Secrets and Confidential Information.   The Company agrees to provide Gardiner [Saldukas] with assistance and access to Confidential Innformation and Trade Secrets necessary to perform her job with the Company.  [Saldukas} agrees that both while employed by the Company and, following termination of her employment with the Company, at any time in the future:

(Doc. #132, Ex. M).  Gaskins' employment contract reads the same.

Eli's claim states that neither Saldukas nor Gaskins can use the information, knowledge and know-how they acquired at any time in the future - over their working lives with GSC and/or Eli.  Such a claim is over broad and impermissible under North Carolina law. Philips Electronics, 631 F.Supp.2d at 715.

As noted in the non-compete section of their respective employment contracts, Eli acknowledges that Saldukas and Gaskins had access to Eli's confidential and trade secret information and limits their ability to use that knowledge and experience to twenty-four (24) months after each left Eli's employment.  North Carolina law states that twenty-four (24) months is a reasonable time limit on a non-competition agreement. Id.  To read the non-disclosure section of the contract without consideration of the non-complete section of the contract would be improper.  The non-compete section clearly states that even though Defendants were exposed and worked with Eli's trade secrets and

confidential information, they could resume their work in the newsletter publication field after twenty-four (24) months of leaving their employment with Eli.  Both Saldukas and Gaskins complied with that restriction.

Eli's interpretation of the employment contract would essentially preclude Saldukas and Gaskins from using their experience and knowledge gained working in the newsletter industry for the rest of their lives. Under North Carolina law employment contracts must be reasonable in time and geographical restrictions. Philips Electronics, 631 F.Supp.2d at 714 -715 (citing A.E.P. Indus., Inc. v. McClure, 308 N.C. 393, 402–03, 302 S.E.2d 754, 760 (1983) (holding a covenant not to compete is valid if it is… reasonable as to time and territory…).  An employment contract that would extend for the life of the individual and prevent that individual from using their skills to obtain work anywhere in North America, as Eli seems to argue, would violate North Carolina law. Accordingly, the Court finds that neither Gaskins nor Saldukas are in breach of their employment contract.

### (3) Whether Dr. Norins' Recipe is Confidential and Owned by Eli

Defendants state that Dr. Norins' recipe is not confidential but widely known and used in the newsletter publication world.  Eli argues that whether or not Dr. Norins' recipe is confidential is irrelevant because it bought all of Dr. Norins know-how information when it purchased GSC and Saldukas and Gaskins are prohibited by the employment contract from using what they learned at GSC.

Eli disputes that Saldukas could use the information she learned from Dr. Norins while she worked at GSC in a competing business arguing that Eli purchased Dr. Norins' recipe when they purchased GSC.  Eli's employment contract did not prevent Saldukas

and Gaskins from ever working in the newsletter business or from using the knowledge they learned in the years they worked for GSC and Eli.   Instead the contract acknowledged that Saldukas and Gaskins learned trade secret and confidential business information and were restricted from using the knowledge they obtained at Eli for twenty-four (24) months.  The employment contract reads in pertinent part:

> [Saldukas] [and Gaskins] further acknowledges that []any disclosure of the Company's Trade Secrets and Confidential Information would be susceptible to immediate competitive application by a competitor; that the Company's business is substantially dependent on access to and the continuing secrecy of Trade Secrets and Confidential Information; and that [Saldukas'] [and Gaskins] acceptance of or participation in any employment, consulting engagement, or other business opportunity for an entity other than the Company where she would perform work of a similar nature to that performed by her for the Company would inevitably result in the disclosure or use of the Company's Trade Secrets and Confidential Information.
>
> Therefore, during [Saldukas'] employment with the Company and for a period of twenty-four (24) months following termination of her employment, she will not, in any capacity, perform services that are similar to those performed by her as an employee of the Company for the benefit of any Competitive Business in North America. . . .

(Doc. #132, Ex. L, Saldukas Depo. Ex. 5, § 10; Ex. M, Gaskins Depo, Ex 3, §7).

As such, nothing in the employment contract between Saldukas, Gaskins, and Eli would prevent the Defendants from applying the knowledge, experience, and know-how they gained working with Dr. Norins' recipe to Coding Leader's newsletters.

(4) *Whether Eli's Editorial Manual and Executive Editorial Manual are Confidential*

Defendants argue that Eli's Editorial and Executive Editorial Manuals are not confidential because they have been used in open court and that Eli gave their manuals to Dr. Norins for use in his new company.  Eli responds that one page of their editorial

guide was published by mistake in a court case by the opposing counsel who failed to file the page under seal.  Eli admits that it shared its Editorial Manuals with Dr. Norins but argues that Eli and Dr. Norins have a confidentiality agreement based upon Eli's purchase of GSC.

Based upon the record, Eli considers its Editorial and Executive Editorial Manuals as confidential and have taken steps to protect the information contained therein.  Eli's explanation of the use of a single page of its Editorial Manual is well taken.  At most, the single page lost its confidential status when it was inadvertently filed and not the entire Editorial Manual.   Eli gave its Editorial Manual and Style Guide to Dr. Norins at another company.  Eli says it has a confidential relationship with Dr. Norins, so distributing its confidential material to Dr. Norins' company would not destroy the confidential nature of Eli's Editorial Manual and Executive Editorial Manual.

Nevertheless, even with Eli's Editorial Manual and Executive Editorial Manual being confidential, the Defendants were free to use their knowledge and experience learned at GSC and Eli to form MHI and Coding Leader under the terms of their respective employment contracts after the twenty-four (24) months had expired. RLM Communications, Inc. v Tuschen, 66 F. Supp. 3d 681, 696 (E.D.N.C. 2014) (acquiring and using knowledge and experience gained from working with an employer, however, does not constitute misappropriation of trade secrets under North Carolina law).

(5) *Whether Defendants Misappropriated Eli's Confidential Information*

The Second Amended Complaint (Doc. #37) states in pertinent part: "Defendants Saldukas and Gaskins, by disseminating, using, and misappropriating the ELI/GSC

Materials in whole or in part during the course of their work for Coding Leader, breached the nondisclosure provisions of the Eli Contracts."  (Doc. #37, ¶128).

Defendants argue there is no direct evidence that Saldukas or Gaskins misappropriated or distributed Eli's confidential or trade secret information.  Eli asserts that while it may not have direct evidence there is plenty of indirect evidence the Defendants used its confidential information.

Eli does not argue in its brief that Saldukas and Gaskins distributed its Editorial Manual and Executive Editorial Manual to other companies, but instead alleges they used the confidential information and trade secrets to create their own newsletters for Coding Leader.  Eli argues that the similar appearance of Coding Leaders newsletters to Eli's newsletters exhibits the misappropriation of Eli's confidential information.

As noted above, the employment contract acknowledged that the Defendants would be exposed to Eli's trade secrets and confidential information.  The employment contract, however, allowed Saldukas and Gaskins to enter the newsletter business twenty-four (24) months after leaving Eli's employment.  The fact that Coding Leader's newsletters look similar to Eli's is not evidence the Defendants improperly used Eli's confidential and trade secret information.  Saldukas worked for Dr. Norins at GSC when Eli purchased GSC.  Eli subsequently hired Saldukas as president of its newsletter division.  Saldukas had years of experience in the newsletter publishing business with Dr. Norins—experience that she brought to Eli from GSC.  It is not surprising that the appearance of Eli's newsletters would be similar in composition and look due to Saldukas' experience and knowledge in the newsletter industry.

Contrary to Eli's claims, they cannot preclude Saldukas and Gaskins from using the know-how and experience they learned while employed by Dr. Norins at GSC or the experience they learned at Eli. *See* RLM Communications, 66 F. Supp. 3d 681, 696 (E.D.N.C. 2014)(citing Engineering Associates, Inc. v. Pankow, 268 N.C. 137, 139, 150 S.E. 2d 56 (1966)(holding "[W]here a person in his new employment undertakes to use the knowledge acquired in the old, it is not unlawful, for equity has no power to compel a man who changes employers to wipe clean the slate of his memory); Travenol Labs., Inc. v. Turner, 30 N.C.App. 686, 695–96, 228 S.E.2d 478 (1976) (holding that an injunction restricting misappropriation of trade secrets should not be "so broad that the defendant [former employee] may be deprived of the right to use his own skills and talents in this work for [the new employer]").

After leaving Eli, both Saldukas and Gaskins complied with the contract's restrictions precluding them from entering the newsletter business for twenty-four (24) months.  Thereafter, Saldukas and Gaskins were free to use their knowledge and experience to re-enter the newsletter industry and compete. Id.  Thus, there is no genuine issue of material fact that the Defendants breached their employment contract by misappropriating or distributing Eli's Editorial or Executive Editorial Manuals.

(6) *Whether Saldukas and Gaskins Can Solicit Employees and Third Parties Who Have Relationships with Eli.*

Eli alleges that Saldukas and Gaskins took and used Eli's confidential information which they contractually agreed not to do by soliciting Eli's customers and by using one of Eli's consulting editors.  Saldukas and Gaskins state they did not violate the non-solicitation clause of the contract.

Eli argues that the non-solicitation clause does not apply to the solicitation of its customers and consulting editors.  Eli's argument is frivolous and lacks merit.  The terms of Saldukas' non-solicitation agreement are as follows:

11.  Non-Solicitation Agreement.

> [Saldukas] acknowledges and agrees that during the course of her employment with the company, she will become familiar with many of the Companies employees, their knowledge, skills, abilities, compensation, benefits, and other matters with respect to such employees not generally known to the public. [Saldukas] further acknowledges and agrees that any solicitation, luring away, inducement to have any third party or individual cease or modify its relationship with the Company, or hiring of the employees of the Company, or other direct or indirect participation in such activities, would be highly detrimental to the business of the Company and would cause the Company great and irreparable harm.  Consequently, [Saldukas] agrees that for a period of twenty-four (24) months following the end of her employment with the Company, [Saldukas] will not, directly or indirectly, solicit, lure, or hire any employee of the Company, or induce any third party or individual to cease or modify its relationship with the Company, or assist or aid in any such activity.  Likewise, for the same twenty-four (24) month period, [Saldukas] will not directly or indirectly, either for herself or any other individual or entity, solicit, divert, take away, or attempt to solicit, divert, or take away any customer or business of the Company.

(Doc. #132, Ex. L, Saldukas Depo. Ex. 5, § 11; Ex. M, Gaskins Depo, Ex 3, § 8).

Eli says the Defendants used one of its consulting editors because her name appeared in the Defendant's publication in March of 2013.  Pursuant to the above stated non-solicitation agreement, the Defendants were precluded from soliciting the consulting editor within twenty-four (24) months of leaving Eli's employment.  Given that Gaskins' employment terminated on June 2, 2009, and Saldukas' employment terminated in March 2010, the twenty-four (24) months had expired in their non-solicitation provisions. Saldukas and Gaskins could have solicited the consulting editor under their respective

employment contract after the twenty-four (24) months.  Further, the names of the consulting editors are listed on the front page of Eli's related publications as well as on their website.  The names of the consulting editors are not confidential.

In regard to Eli's claims that Defendants solicited its confidential customer or subscribers list, North Carolina law does not always protect such lists because they can be obtained from other sources. Combs & Associates, Inc. v. Kennedy, 147 N.C. App. 362, 369-70, 555 S.E. 2d 634, 640 (2001) (holding that a customer database was not protected as a trade secret because defendants could have complied a similar database through publicly available information, such as trade show and seminar attendance lists); Novacare Orthotics & Prosthetics East, Inc. v. Spellman, 137 N.C. App. 471, 478, 528 S.E. 2d 918, 922 (2000) (finding that a list of customer names and addresses was not a trade secret)).

Here, Defendants state they obtained their customer lists by purchasing the names from a service that supplies such lists.  Given that medical coders are such a specialized group, it would be easy to discover the names of the various physicians' coders by simply looking in the phone book for various doctors' offices, by attendance at a trade show or review of a seminar attendance list or by simply conducting a Google search for coders. Thus, based upon North Carolina law, Eli's subscriber lists are not protected.

## <u>CONCLUSION</u>

Based upon the record before the Court, there is no genuine issue of material fact that that Saldukas and/or Gaskins breached their employment contract with Eli. Consequently, the Defendants' Motion for Summary Judgment is due to be granted.

Accordingly, it is now

**ORDERED:**

The Defendants, Samantha Saldukas and Lacy Gaskins' Motion for Summary Judgment against the Plaintiffs Eli Research LLC and American Academy Holdings, LLC (Doc. #132) is **GRANTED.**  Count VII of the Second Amended Complaint is **DISMISSED**.

**DONE** and **ORDERED** in Fort Myers, Florida this 6th day of October, 2015.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record